UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

BROOKS WELCH and :
KAREN WELCH, h/w :
 :
 v. :
 : NO. 20-cv-03525
 :
CIGNA HEALTH AND LIFE :
INSURANCE COMPANY :
-and- :
PQ CORPORATION :
 :

## AMENDED COMPLAINT

NOW COMES Plaintiff, Brooks Welch, by and through counsel, and hereby alleges as follows:

BACKGROUND

1. This case involves the Defendant's application of the Medicare Secondary Payer (MSP) rules and its interplay with plaintiff's COBRA coverage. In particular, plaintiff incurred certain medical bills between May 1, 2018, when his employment was formally terminated by PQ upon his eligibility for long term disability, and September 1, 2018, when he became eligible for Medicare Part B benefits (the "COBRA window"). As set forth more fully herein, Defendants have processed his health insurance benefits during the COBRA window as if Medicare Part B were the primary insurer, even though Mr. Welch was not yet covered by Part B, paying therefore as the secondary payer, and leaving Mr. Welch with tens of thousands of dollars in medical bills.

1

PARTIES, VENUE AND JURDISCTION

2. Plaintiff was, at all time relevant a "participant" within the meaning of ERISA, in the PQ Corporation Life & Health Care Plan sponsored by PQ Corporation ("the Plan"). The Plan provides, *inter alia*, health insurance benefits to PQ employees and eligible dependents.

3. Defendant CIGNA Health and Life Insurance Company ("CIGNA") is the claims administrator for claims filed under the Plan and a fiduciary of the Plan within the meaning of ERISA.

4. Defendant PQ Corporation is the Plan Sponsor and a fiduciary of the Plan within the meaning of ERISA.

5. The PQ Corporation Benefits Plan Committee is the Plan Administrator of the Plan.

6. This Court has federal question jurisdiction pursuant to 28 U.S.C. Section 1331, and pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Section 1132(a)(1)(B).

7. Venue is appropriate in this Court pursuant to the nationwide service of process under ERISA (29 U.S.C. Section 1132(g), as plaintiff resides in the district, and the alleged breach is deemed to occur here.

FACTS

8. Plaintiff became employed by PQ on or about July 12, 2010.

9. Mr. Welch has been diagnosed with neuroendocrine cancer.

10. Neuroendocrine cancer is terminal; no known cure exists.

11. Mr. Welch became eligible for hospital insurance under Medicare ("Part A") effective October, 2011. Under the extended work incentive provisions of Medicare, he was

       eligible for up to 93 months (7 years and 8 months) of premium free Part A coverage. 42 C.F.R. Section 406.12(e).  As a result, Mr. Welch maintained his Part A coverage from 2011 until the end of his employment with PQ.  Given that he did not have to pay premiums, there appeared to be no reason for him to discontinue his Part A coverage, and as long as he remained actively employed, his Medicare coverage had no effect on his coverage under the PQ Plan.

12. As a result of the progression of his cancer, Mr. Welch was forced to stop working in October, 2017.  He applied and was approved for short-term disability.

13. In the spring of 2018, having been out on short-term disability for the required waiting period, Mr. Welch went on long term disability.  He remains on long-term disability under PQ's long-term disability policy.

14. Effective on or about May 1, 2018, Mr. Welch's employment with PQ was formally terminated.  As a result, Mr. Welch became eligible for continuation coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA).  Mr. Welch promptly applied for COBRA continuation coverage.  On information and belief, that coverage became effective May 1, 2018.

15. In the meantime, Mr. Welch had applied for Social Security disability benefits (SSDI).  His SSDI application was approved on October 2, 2018.  According to the award, he became retroactively entitled to SSDI effective November, 2017, and became eligible for Medical Insurance (as opposed to Part A Hospital insurance) under Medicare (commonly referred to as "Part B") effective September 1, 2018.

16. Between May 1, 2018, during the time period that Mr. Welch was enrolled in COBRA, but not yet entitled to Medicare Part B, he incurred tens of thousands of dollars in

medical bills (the "COBRA Medical Claims").  This included, among others, a bill from the Hospital of the University of Pennsylvania (HUP) for services rendered on July 25, 2018 in the amount of $9,113.00; a bill from HUP for services rendered on August 9, 2018 in the amount of $39,106.64; and a bill from University of Pennsylvania Health System for services rendered on August 31, 2018 in the amount of $27,818.41.  In addition, CIGNA is also seeking reimbursement for an alleged overpayment in the amount of $8,239.12.

The Medicare Secondary Payment Rules

17. Congress has adopted a series of rules designed to reduce Medicare's obligations to pay in certain situations.  These are known as the Medicare Secondary Payment Rules. The MSP Rules are implemented by the Centers for Medicare and Medicaid Services (CMS), a division of the Department of Health and Human Services.

18. Under the MSP rules, the PQ Plan qualified as a Large Group Health Plan ("LGHP").

19. During the time that he was an active employee (including his time on short-term disability), the PQ plan was primary and Medicare Part A was secondary for any claims covered by Part A.  Mr. Welch was not enrolled in Part B, so the PQ Plan was solely responsible for any bills that would otherwise be covered by Part B.

20. Once Mr. Welch became eligible for COBRA coverage, and was no longer an active employee, his change in status triggered a change in the rules.   In particular:

> CMS make Medicare primary payments for services furnished to disabled beneficiaries covered under the LGHP by virtue of their own or a family member's current employment status if the services are –
>
> . . .    (5) Covered under COBRA continuation coverage notwithstanding the individual's Medicare *entitlement.*
>
> 42 C.F.R. Section 411.206(a)(5)(emphasis added).

21. Under Medicare, there is a distinction between being "eligible" for Medicare and being "entitled" to Medicare.

22. Being "eligible" for Medicare means that an individual *can* enroll in Medicare, e.g, that he or she has turned 65, has been determined to be eligible for SSDI (i.e., is disabled and has exhausted the relevant waiting period) or met other criteria. But being "entitled" to Medicare means that the individual is both eligible for Medicare *and has enrolled*.

23. Indeed, an individual can be terminated early from COBRA once he or she becomes *entitled* to Medicare. That is exactly what happened here – once Mr. Welch became entitled to Medicare Part B benefits, he was no longer eligible to continue his COBRA benefits.

Cigna's Processing Of The Claims

24. For the COBRA Medical Claims, CIGNA processed the claims as if Medicare Part B were primary, and the Plan were secondary, even though Mr. Welch did not become *entitled to* Part B until he was awarded social security disability benefits. In doing so, it calculated the amount that Medicare would have paid under Part B, and only then paid the small balance of the outstanding charges.

25. For example, CIGNA paid $308.17 of the $9,113.00 bill and $2,760.86 of the $39,106.64 bill.

26. The alleged underpayment constitutes an "adverse benefit determination" in part under ERISA and the Department of Labor's claims regulations thereunder. CIGNA was obligated, as the Claims Administrator, to comply with the Department of Labor's claims regulations as set forth in 29 C.F.R. Section 2560.503–1.

27. CIGNA initially denied the claims in part by issuing "Explanations of Benefits" (EOB'S).

28. The EOB's fail to comply with the Department of Labor claims regulations.

29. Under the claims regulations, CIGNA had 30 days after receipt of the claim. The deadline may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render the decision.

30. CIGNA initially issued an EOB explaining that it could not "process the claim without the Medicare explanation of Benefits (EOB). It noted:

    Patient: If you never enrolled in Medicare, please call us at the number on your ID card. We need to hear from you before we can process the claim (emphasis added).

    This statement failed to adequately explain to Mr. Welch the issue or the need to call CIGNA so that it could explain to him that, with the commencement of COBRA, he was at risk of not having his claims fully paid until he enrolled specifically in Part B. Quite simply, he *had* ever enrolled in Medicare – he was still enrolled in Part A. CIGNA did not ask him to call if he were enrolled in Part A, but not Part B, and given that the distinction had not made any difference before he enrolled in COBRA, he had no reason to believe that there was an issue which he could mitigate by trying to enroll immediately in Part B.

31. CIGNA subsequently rendered the formal adverse benefit determinations by the issuance of additional EOB's. Those EOB's failed to comply with the claims regulations in numerous ways.

32. In particular, the Claims Regulations state, *inter alia*, that the Adverse Benefit Determination must set forth, in a manner calculated to be understood by the claimant:

    (i) The specific reason or reasons for the adverse determination;

    (ii) Reference to the specific plan provisions on which the determination is based.

    29 C.F.R. Section 2560.503-1(g).

33. The only explanation regarding the basis for payment was the following statement:

    Our records indicate that you're eligible for Medicare but did not enroll. You are responsible for the estimated amount Medicare would pay if you enrolled.

    The EOB's did not make specific reference to the plan provision setting forth the instances in which the MSP rules would be triggered. In particular, it failed to inform Mr. Welch that the underlying predicate for Medicare now being primary, rather than secondary, was that he was no longer an active employee, and that his status as a former employee on COBRA had triggered the Plan's status as a secondary payer. Given that Mr. Welch had been enrolled in Part A, but not part B, it also failed to make clear to him that his failure to enroll in both Parts A *and* B now changed how the Plan would pay claims covered under Part B. Given that Mr. Welch remained enrolled in Part A, the blanket statement "you're eligible for Medicare but did not enroll" was factually incorrect and failed to put Mr. Welch on notice as to how he could perfect the claim or mitigate future bills by taking steps to immediately enroll.

34. Indeed, given that the Social Security Administration did not approve his SSDI claim until November, with a Part B enrollment date of September, it is not clear whether Mr. Welch would, in fact, have been eligible to enroll in Part B as of the date he commenced COBRA.

35. On or about May 16, 2019, Mr. Welch, through counsel, timely appealed CIGNA's decision to apply the estimated Medicare Part B allowance to the July 25 and August 9, 2018 services (in the amount of $9,113.00 and $39,106.64, respectively).

36. CIGNA denied the appeal by letter dated June 5, 2019.

37. On or about October 11, 2019, Mr. Welch, through counsel, timely appealed CIGNA's decision to apply the estimated Medicare Part B allowance to the August 31 services (in the amount of $27,818.41).

38. CIGNA denied the appeal related to the August 31 services by letter dated November 18, 2019.

39. In the appeal denial letters, CIGNA explained that it had applied the estimated Medicare Part B allowance in processing the allowance for the claims.

40. In particular, the appeal denials, inter alia, stated the following:

    Since you are *entitled* to Medicare Part B, but did not enroll, CIGNA estimates the amount Medicare Part B would have paid if you were enrolled in Medicare Part B and only covers the amount your Cigna plan would have paid as a secondary payer (emphasis added).

41. The rationale was wrong on two counts: (1) it conflates the definition of eligibility and entitlement under the Medicare Secondary Payment Rules; and (2) Mr. Welch was neither eligible nor entitled to Medicare Part B until September 2018, per his Social Security disability award.

42. In applying the presumed Part B award, CIGNA relied on the plan provisions describing the instances in which it would be deemed secondary. It listed six different situations, without explaining which one actually applied to Mr. Welch. In fact, the only arguable applicable provision was, "a former Employee who is eligible for Medicare and whose insurance is continued for any reason as provided in this plan" (emphasis added).

43. CIGNA also cited to the provisions of the Plan which states as follows:

Cigna will assume the amount payable under:

Part A of Medicare for a person who *is eligible for that Part* without premium payment, but has not applied, to be the amount he would receive if he had applied.

**Part B of Medicare for a person *who is entitled to be enrolled in that Part*, but is not, to be the amount he would receive if he were enrolled.**

Part B of Medicare for a person who has entered into a private contract with a provider, to be the amount he would receive in the absence of such private contract.

**A person is considered eligible for Medicare on the earliest date any coverage under Medicare could become effective for him.**

44. The same language set forth in the preceding two paragraphs appears in the Summary Plan Description for the Plan.

45. The Summary Plan Description fails to adequately apprise a plan participant, in language that can be reasonably understood by a plan participant, that his termination at the end of a period of long term disability and his right to maintain benefits under COBRA would result in a change in the MSP rules.

46. First, the specific provision relied upon ("a former Employee who is eligible for Medicare and whose insurance is continued for any reason as provided in this plan") does not make clear that COBRA continuation falls within that provision. One could conclude that the provision is limited to circumstances arising from the structure of the Plan itself, rather than by COBRA, which coverage is continued not because the Plan so provides, but as a matter of law.

47. In addition, a reasonable plan participant would be led to believe that the difference in the language between the Part A Clause ("eligible for that part") and Part B Clause ("entitled to be enrolled") had meaning and that "entitled to be enrolled" was more limited than

mere eligibility. Indeed, as noted, according to his social security award, Mr. Welch was not entitled to be enrolled in Part B until September 1.

48. In denying the claims, it appears that CIGNA relied on this last sentence – i.e., because Mr. Welch was eligible for *Part A*, he was eligible for Medicare, and therefore the Part B offset would be triggered, even though he was neither entitled to be nor enrolled in that Part.

49. CIGNA's interpretation of the last sentence makes no sense. The provision as a whole makes clear that the Part A and Part B offsets are to be treated separately. Indeed, the second section makes clear that the Part B offset is only triggered if the participant is *entitled to be enrolled **in that part***, but is not. Mr. Welch was not entitled to be enrolled in Part B until he received his social security award which made him first entitled to Part B benefits as of September 1.

## COUNT I

**(Claim for Benefits)**
**29 U.S.C. Section 1132 (a)(1)(B)**

50. Plaintiff incorporates the prior allegations of the Complaint as though fully set forth herein.

51. To the extent that the plan provisions are meant to comply with the Medicare Secondary Payer rules, to the extent CIGNA has interpreted them inconsistent with the rules, its determination that the Plan was secondary for the period from May to September, while Mr. Welch was on COBRA, is wrong as a matter of law.

52. In the alternative, Defendant CIGNA's interpretation of the Plan and the Medicare Secondary Payer rules to determine that the Plan is secondary in this circumstance is arbitrary and capricious.

WHEREFORE plaintiff seeks judgment in his favor, and against defendants for: (1) an Order declaring that the Plan should be the primary payer of the COBRA Medical Claims; (2) prejudgment interest; (3) reasonable attorneys fees and costs; and (4) such other relief as the Court deems appropriate.

**COUNT II**
**(Breach of Fiduciary Duty)**
**29 U.S.C. Section 1132 (a)(3)**
**(v. PQ)**

53. This Count is pled in the alternative to Count I, and only to the extent that the Court determines that plaintiff is not entitled to payment under the Plan as primary.

54. The Summary Plan Description for the Plan fails to comply with ERISA.

55. ERISA provides, *inter alia*:

    The summary plan description shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan

    (b)The summary plan description shall contain the following information: . . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.

    29 U.S.C. Section 1022

56. Similarly, the Code of Federal Regulation provides that a Summary Plan Description must provide:

    > For both pension and welfare benefit plans, a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, *reduction*, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraphs (j) and (k) of this section. In addition to other required information, plans must include a summary of any plan provisions governing the authority of the plan sponsors or others to terminate the plan or amend or eliminate benefits under the plan and the circumstances, if any,

>under which the plan may be terminated or benefits may be amended or eliminated; a summary of any plan provisions governing the benefits, rights and obligations of participants and beneficiaries under the plan on termination of the plan or amendment or elimination of benefits under the plan, including, in the case of an employee pension benefit plan, a summary of any provisions relating to the accrual and the vesting of pension benefits under the plan upon termination; and a summary of any plan provisions governing the allocation and disposition of assets of the plan upon termination. Plans also shall include a summary of any provisions that may result in the imposition of a fee or charge on a participant or beneficiary, or on an individual account thereof, the payment of which is a condition to the receipt of benefits under the plan. The foregoing summaries shall be disclosed in accordance with the requirements under 29 CFR 2520.102-2(b).
>
>§2520.102-3(l)(emphasis added).

57. To the extent that Mr. Welch's prior eligibility for Part A triggered the Medicare Secondary Payer rules for Part B upon his termination of employment, the summary plan description failed to apprise Mr. Welch of such in a manner which would have been understood by the average plan participant.

58. At no time from the onset of his short-term disability until his election of COBRA benefits did PQ advise Mr. Welch that if his employment were terminated at the conclusion of his short-term disability, the Plan would become secondary to Medicare for both Parts A and B, even if he elected COBRA coverage.

59. In addition, at the time PQ informed Mr. Welch that he was going to lose his medical coverage based on his termination as an active employee, it did not inform him that if he elected COBRA coverage, it would only pay as a secondary payer, nor did it advise him that he needed to immediately apply for Part B or risk a reduction in his coverage.

60. In fact, in conversations with Mr. Welch and his wife, who acted as his duly authorized agent, a representative of PQ repeatedly assured them that his termination as an active employee would have no effect on his benefit levels if he continued under the policy through COBRA.

61. The representative knew, or should have known, that Mr. Welch already was covered by Part A, as there had previously been an issue regarding the coordination of benefits between the Plan and Mr. Welch's Medicare coverage while he had still been employed, when the then claims administrator (Aetna) had improperly processed some claims as if the Plan had been secondary.

62. PQ knew, or should have known, given Mr. Welch's illness, his disability, the reason for his termination and its knowledge that his prior eligibility for Part A, that the Medicare Secondary Payer rules could result in the reduction of his benefits under the Plan.

63. Had Mr. Welch known or been advised of the effect that Medicare Part A had on the payment of his Medicare Part B claims, he could have taken affirmative steps to eliminate or mitigate the risk, including but not limiting to, cancelling his Part A coverage, starting the application for SSDI and Part B coverage sooner, and/or delaying some or all of the medical procedures until his Part B coverage was in place.  This is especially true for the procedures on August 31, which occurred the day before his Medicare Part B eligibility.

WHEREFORE plaintiff seeks judgment in his favor, and against Defendant PQ in the form of an order for "appropriate equitable relief" within the meaning of ERISA

(including, but not limited to, equitable reformation of the Plan, estoppel of the application of the Plan provisions, surcharge or otherwise), together with reasonable attorneys fees and costs.

*Michael J. Salmanson*
_____
Michael J. Salmanson
Salmanson Goldshaw, PC
2 Penn Center, Suite 1230
1500 JFK Boulevard
Philadelphia, PA 19102
215-640-0593
215-640-0596 (fax)

Attorney for Plaintiffs

Date:  October 12, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that I have caused a true and correct copy of the foregoing Notice of Appearance to be served via the Court's Electronic Filing System upon Defendants' counsel as follows:

>Nipun Patel
>Corey A. Thomas
>Holland & Knight, LLP
>Cira Centre
>2929 Arch Street, Suite 800
>Philadelphia, PA. 19104
>
>Attorneys for Defendant, CIGNA Health and Life Insurance Company
>
>Elizabeth A. Malloy
>Cozen O'Connor
>1650 Market Street, Suite 2800
>Philadelphia, PA 19103
>
>Attorney for Defendant, PQ Corporation

_____
Michael J. Salmanson
Salmanson Goldshaw, PC
2 Penn Center, Suite 1230
1500 JFK Boulevard
Philadelphia, PA 19102
215-640-0593
215-640-0596 (fax)

Attorney for Plaintiffs

Date: October 12, 2020